IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Elaine L. Chao, Secretary,                        *
United States Department of Labor,                *

    Plaintiff,                                  *

      v.                                         *        CIVIL NO. RDB 03-3409

Self Pride, Inc. and Barbara A. Robinson,         *

    Defendants.                                 *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>MEMORANDUM OPINION</u>

The Secretary of the United States Department of Labor brought the instant action against Defendants Self Pride, Inc. and Barbara A. Robinson (collectively "Defendants") alleging violations of the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. § 201, *et seq.*[1]  On June 14, 2005, the Court granted, in part, Plaintiff's Motion for Partial Summary Judgment and entered judgment in favor of the Plaintiff on the question of Defendants' liability for violations of the FLSA related to pay practices concerning Community Living Assistants ("CLAs").  More specifically, this Court held that there was no genuine issue of material fact with respect to Defendants' violation of 29 U.S.C. § 207(a)(1) ("overtime provision") of the FLSA in failing to compensate employees for overtime wages and 29 U.S.C. § 211(c) ("record-keeping provision") in failing to make, keep and preserve adequate and accurate records regarding employee wages, hours, and other conditions of employment.  In addition, the

---

[1]  Self Pride, Inc. is a Maryland nonprofit corporation which operates eight community living facilities in the City of Baltimore.  Defendant Barbara A. Robinson is the president, executive director and chief executive officer of Self Pride.  Self Pride is primarily engaged in the care of the mentally ill, mentally retarded and/or developmentally disabled persons who reside in the community living centers.

Court determined that the affected Self Pride employees were entitled to liquidated damages as a matter of law and that Barbara Robinson can be held personally liable for Self Pride Inc.'s FLSA violations.

The Defendants' liability having been determined on summary judgment, certain issues remained for trial.  The first issue was whether Defendants willfully violated the FLSA, such as to trigger an exception to the two year statute of limitations.  *See* 29 U.S.C. § 255(a) (providing for a three year statute of limitations period when a FLSA violation is willful).  The second issue was an appropriate damages figure for Defendants' liability as determined by the Court on summary judgment.  *See* 29 U.S.C. § 217.  In addition, Plaintiff also sought injunctive relief. *See id.*  Both parties presented evidence and argument on these issues during the non-jury trial that was conducted on October 24, 25, 26, 27 and November 1 and 2, 2005.  On November 15, 2005, the parties submitted post-trial proposed findings of fact and conclusions of law.  On November 22, 2005, Plaintiff submitted updated damages figures, and supporting documentation, through October 16, 2005.[2]

The Court, having considered the evidence presented at trial and having reviewed the parties' post-trial submissions, finds that Defendants did not act willfully and, therefore, a two year statute of limitations period applies.  The Court enters judgment in favor of Plaintiff and against Defendants in the amount of $527,903.63.  The Court also grants Plaintiff's request for permanent injunctive relief.

Based on the declarations submitted to the Court and the testimony of the witnesses at

---

[2]  Plaintiff also submitted a letter on November 23, 2005, clarifying a portion of her November 22 submission.

trial and the exhibits presented, the Court, pursuant to Rule 52 of the Federal Rules of Civil

Procedure, makes the following findings of fact and conclusions of law.

I.      Findings of Fact

In August 1998, Investigator James Kessler of the Baltimore District Office of the Wage

and Hour Division of the Employment Standards Administration of the United States

Department of Labor took over the investigation of Defendant Self Pride, Inc. ("Self Pride")

from another investigator.  Kessler's investigation of the organization focused on CLAs who

were working weekend shifts.  In particular, if an employee worked two weekend shifts, totaling

48 hours, the employee was only being paid 40 hours.

On September 30, 1998, Kessler met with Barbara Robinson and her son, Jerome

Robinson, who was Self Pride's business manager at the time.  Kessler indicated the

Government's position that Self Pride's weekend shift practices violated the overtime

requirements of the FLSA.  He indicated that Self Pride should be compensating the employees

for the full 48 hours, instead of just 40.  Although Kessler indicated that this was a violation of

the FLSA, he did not apparently explain what provisions were violated, go into further detail

about these compliance issues, or show the Robinsons specific examples of violations.  Barbara

Robinson and Jerome Robinson disagreed with Kessler's assessment that their time keeping

practices violated the FLSA, believing that employees were taking permissible unpaid breaks.

At the time of this meeting no written notice was provided to Self Pride concerning the FLSA

(e.g.,  bulletins or copies of pertinent regulations) or the violations apparently identified by

Kessler.  Nor was any written information provided about how to correct the violations that

Kessler had identified.

No further contact was made with Self Pride until April 9, 1999 when Kessler called Jerome Robinson. During this phone call Kessler reiterated the Government's position concerning overtime violations. Jerome Robinson disagreed with Kessler's assessment. No written information was sent to the Defendants at the conclusion of the phone call.

That same month, Kessler was reassigned to other matters and no longer was handling the Self Pride file. He remained in the Baltimore office until October of 2000 and then was transferred to Washington D.C. The Government did not assign another investigator to the Self Pride file for almost two and a half years.

In September 2001, John Sliwka, a United States Labor Department investigator, was assigned to the Self Pride file. Sliwka, however, did not have a conversation with the Defendants about violations of the FLSA until March 2002. On March 6, 2002, Sliwka met with Barbara Robinson and informed her that Self Pride was violating the FLSA by not properly compensating weekend employees for time worked and for overtime. During this conversation, Sliwka referenced a regulation concerning compensation for sleep time and informed Barbara Robinson that she was not meeting these regulations.

On March 15, 2002, Sliwka called Barbara Robinson to determine her position regarding compliance and she indicated that she intended to come into compliance. She indicated that she was going to meet with company officials to work out a revised staffing schedule. She also indicated to Sliwka that she wanted to contact an attorney to discuss the issues that Sliwka had raised, which she apparently did.[3] Although Sliwka provided Barbara Robinson with a copy of the sleep time regulation, he could not say with certainty whether he provided Barbara Robinson

---

[3] It is unclear how quickly Barbara Robinson contacted an attorney, but "several months" later Mr. Neal Janey, Defendants' counsel, contacted Sliwka on behalf of the Defendants. (Sliwka testimony 35:16-18.)

with a summary of unpaid wages that he prepared.  (*See* Gov. Ex. 752.)

After the initial meeting between Kessler and the Robinsons in September of 1998, with the exception of the phone call in April 1999, the Government did not have any additional contact with the Defendants, or a representative of Self Pride, until approximately three years later, when Sliwka met with Barbara Robinson.

From November 30, 1999 through July 2004, Self Pride altered timesheets of its CLAs in order to reduce the number of hours for which its employees were credited with working. Employees were "double-docked" for arriving late to their shifts and time was deducted from their timesheets when they failed to follow an hourly call-in procedure.  Furthermore, Self Pride limited employees to 20 hours of pay per day for 24 hour weekend shifts, even if the employee did not take a break.

Plaintiff submitted back wage calculations performed by Billie Preston, the Assistant District Director, Baltimore District Office, U.S. Department of Labor, Wage-Hour Division. Preston and his staff, under his supervision, calculated back wages based on their review of all available data including over 3,500 timesheets submitted by Defendants.

The time and pay records Defendants produced to Plaintiff prior to trial were incomplete. The timesheets covered only the period from November 30, 1999 through July 25, 2004.[4]  In many cases, the available payroll records did not accurately reflect the amount of hours recorded by the employees on their timesheets.  Revised numbers and calculations were based on additional records received during trial.  In addition, the Court requested Plaintiff to submit

---

[4]  For this time period, of the 413 employees for whom Plaintiff computed back wages, 72 had no timesheets at all.  Of the 341 employees who had at least one timesheet, 30 had timesheets covering less than 30% of their pay records.  See *infra* n. 5 discussing statute of limitations periods.

numbers and calculations based on a two year statute of limitations period.  For the period

covering September 4, 2000 through October 16, 2005,[5] 392 Self Pride CLAs were owed back

wages.  As determined by this Court on summary judgment, Plaintiff is entitled to collect

liquidated damages for the 120 employees listed in Plaintiff's First Amended Complaint.  Of the

120 employees listed, Preston determined that 96 were due back wages for the period covering

September 4, 2000 through October 16, 2005.

Where available, Preston relied on timesheets to calculate the actual hours worked by

Self Pride's current and former employees.  Based on this Court's summary judgment ruling,

Preston assumed that the hours recorded by employees were actual hours worked except in cases

where there were obvious math errors.  When Preston saw time that was crossed out on a

timesheet, he considered that the time recorded by the employee was correct.  For weekend

shifts, when an employee indicated that he or she worked for a 24 hour period, but only 20 hours

of the time was allowed for on the timesheet, Preston credited the employee for 24 hours.

Based on the absence of many of Defendants' time and pay records, Plaintiff calculated

back wages through reconstruction in instances where employees' timesheets were missing.  For

employees with timesheets available for 30% or more of their pay periods, Preston developed an

_____

[5] Plaintiff's Complaint was filed on December 1, 2003 and normally the statute of limitations period would run from this date.  However, in January 2003, the parties executed a tolling agreement (Gov. Ex. 659) that reads, in pertinent part: "[t]he Secretary and the undersigned employers agree that the time period beginning on November 30, 2001 until and including February 26, 2003 ("the tolling period") will not be included in computing the time limited by any statute of limitations. . . .  The Secretary and the undersigned employers specifically agree that any applicable statute of limitations shall be tolled for the entire tolling period set forth therein."

The ending date of October 16, 2005 is permissible under Section 17 of the FLSA.  *See* 29 U.S.C. § 217. Section 17 enables Plaintiff to recover back wages for continuing violations of the FLSA, even if these violations post-date the period initially investigated by the government.  *See Herman v. Hector I. Nieves Transport, Inc.*, 91 F. Supp. 2d 435 (D.P.R. 2000); *United States Dep't. Of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775 (6th Cir. 1995).

individual average amount of back wages due.  This average was derived by totaling the amount

of back wages due for that employee for all time periods with corresponding timesheets and then

dividing that total by the number of pay periods with timesheets.  This average was then

multiplied by the number of pay periods for which there were no corresponding timesheets to

derive the reconstructed back wages due.  This reconstructed amount was then added to the

amount of back wages calculated based on "hard data"[6].  The sum constituted the total back

wages due for that employee.

For employees with timesheets available for less than 30% of their pay periods, Preston

developed a "universal average" of back wages due.  To derive the universal average, he totaled

all the back wages for all employees for all pay periods with corresponding timesheets.  He then

divided that total by the number of pay periods for all employees with a corresponding

timesheet.  The universal average was then multiplied by the number of pay periods an employee

worked to derive the back wages due that employee.  Based on this method, at trial Preston

testified that he calculated a universal average of $61.46 per pay period.  This universal average

of $61.46 was calculated based on the period November 30, 1999 through December 26, 2004,

which is the time period that would have applied in the event the Court concluded that

Defendants' FLSA violations were willful.

However, based on additional records produced by Defendants during trial, Preston

recalculated the universal average after trial.  The revised universal average number was $58.12,

for the period November 30, 1999 through October 16, 2005.  The revised universal average

number was $59.23, for the period September 4, 2000 through October 16, 2005, which is the

---

[6]  The timesheets themselves were considered "hard data".

time period that applies upon a finding that Defendants' FLSA violations were not willful.

In all respects, this Court finds Preston to have been a very credible witness.  His calculations were reasonable and supported by the evidence.  Furthermore, Preston used a conservative approach in calculating back wages.  For example, Preston testified that he did not calculate back wages for house managers because they might have been exempt under the regulation governing the exemption for executive employees as it existed prior to August 24, 2004.

Based on Preston's post-trial calculations, Defendants owe $372,663.91 in back wages to 392 current and former employees.  These back wages cover the time period from September 4, 2000 through October 16, 2005.  Based on this same time period, 96 employees are owed liquidated damages in the amount of $155,239.72.  Accordingly, these back wages and liquidated damages total $527,903.63.

II.     Conclusions of Law

A.     Willfulness

The Portal-to-Portal Pay Act provides that enforcement actions for violations of the FLSA must be commenced within two years "except that a cause of action arising out of a *willful* violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a) (emphasis supplied).  Violations are willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 128 (1985); *see also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Martin v. Deiriggi*, 985 F.2d 129, 135 (4th Cir. 1993).  In

this case, a determination concerning the Defendants' willfulness impacts the period for which Plaintiff can seek damages in the form of back wages.

Plaintiff argues that the nature of Defendants' violations, such as deliberately deleting an employee's compensable hours and deducting time for breaks without attempting to monitor whether the breaks were actually taken, is sufficient to show that Defendants willfully violated the FLSA. Plaintiff relies on *Donovan v. Grantham,* 690 F.2d 453 (5th Cir. 1982) for the proposition that manipulation of timesheets alone can support a willfulness finding under the FLSA. In *Grantham*, the United States Court of Appeals for the Fifth Circuit explained that the defendant had willfully violated the FLSA as a matter of law because he "knew that he was governed by the Act since he had already been investigated by the Department of Labor two times and the investigator had given him *detailed* explanations of the Act's requirements on both occasions." *Id.* at 458 (emphasis added). The Fifth Circuit went on to note: "In addition, there is evidence that Grantham's violation was willful in the intentional sense in light of his manipulation of the payroll records to disguise his failure to pay overtime." *Id.* The Fifth Circuit did not find, as the Plaintiff suggests, that manipulation of payroll records alone constitutes *per se* willfulness. Based on the facts of this case, the nature of the violations in and of themselves do not support a determination that the Defendants *willfully* violated the FLSA.

In *Herman v. Palo Group Foster Home, Inc*., 183 F.3d 468 (6th Cir. 1999), the United States Court of Appeals for the Sixth Circuit noted that "a violation of the Act was willful where undisputed evidence showed that the employer 'had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his assurance of future compliance with the FLSA.'" *Id.* at 474 (quoting *Dole v. Elliott Travel &*

9

*Tours, Inc.,* 942 F.2d 962, 967 (6th Cir. 1991)).  Plaintiff cites *Palo Group Foster Home* to support that Defendants' violations were willful because prior investigations of Self Pride established Defendants' requisite knowledge or reckless disregard of the FLSA's requirements. In *Palo Group Foster Home,* the Fifth Circuit, in upholding the district court's finding of willfulness, stated that "there is undisputed evidence that [the Defendant] had actual notice of the requirements of the Act." *Palo Group Foster Home,* 183 F.3d at 474.  The Defendant had been twice investigated for violations, paid unpaid overtime wages, received explanations of what was required to comply with the Act, and provided assurances to the Department of Labor that he would comply with the FLSA in the future.  *Id.*; *see also Reich v. Monfort, Inc.*, 144 F.3d 1329, 1334 (10th Cir. 1998) (upholding district court's finding of willfulness, in part, because defendant had paid back wages as the result of previous investigations finding FLSA violations). The facts in *Palo Group Foster Home* are clearly distinguishable from the facts in this case.

Kessler's investigation of Self Pride did not provide sufficient notice to establish that Defendants had actual notice of the requirements of the FLSA and, notwithstanding such knowledge, recklessly disregarded or willfully violated the FLSA's requirements.  Kessler did not specify what provisions were being violated during either his September 30, 1998 meeting with the Robinsons or during his April 9, 1999 phone conversation with Jerome Robinson.  He apparently did not go into any detailed explanations about regulations concerning weekend shift practices and describe the difference between compensable breaks and non-compensable breaks. He did not leave or send any literature to Defendants for review.  Unlike in *Donovan v. Grantham,* 690 F.2d 453 (5th Cir. 1982) and *Herman v. Palo Group Foster Home, Inc*., 183 F.3d 468 (6th Cir. 1999),* Defendants did not receive detailed explanations of the FLSA's

requirements nor specifics describing how they could come into compliance. As previously noted, there was a significant gap in time between Kessler's contact with Self Pride and Sliwka's March 6, 2002 meeting with Barbara Robinson.

When Sliwka met with Barbara Robinson on March 6, 2002, he provided more detail than Kessler concerning his assessment that Defendants were violating the FLSA. He referenced a specific regulation concerning sleep time compensation, which he provided to Barbara Robinson, but it is unclear whether this regulation was discussed in great detail. It is also unclear whether he discussed with Barbara Robinson how she could come into compliance by providing her with a copy of a summary of unpaid wages that he had prepared.

Assuming *arguendo* that Sliwka's conversations with Barbara Robinson in March 2002 provided sufficient notice to make future violations willful, there is evidence that Barbara Robinson took steps to investigate the issue raised by Sliwka, including seeking the counsel of an attorney. While the United States Court of Appeals for the Tenth Circuit has noted that violations need not be determined through litigation in order to establish that later violations were willful, *Monfort*, 144 F.3d at 1335, "[n]egligence or an incorrect assumption that a pay plan complies with the FLSA do not meet the criteria for a willful violation of the FLSA." *Terwilliger v. Home of Hope*, 21 F. Supp. 2d 1305, 1308 (D. Okla. 1998) (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)). Furthermore, in most instances a good faith disagreement with the government regarding the FLSA cannot alone support a later finding by a court that a defendant acted willfully.

Therefore, the Court does not find by a preponderance of the evidence that Defendants acted willfully. Defendants did not receive sufficient initial notice from the government

11

investigator to establish that they had specific knowledge of specific violations or showed reckless disregard in committing those violations.  Furthermore, Defendants' disagreements with the investigators' assessments does not constitute willfulness in this case.  As a result, damages shall be assessed applying a two year statute of limitations period, commencing September 4, 2000.

        B.       Representational Testimony

It is well settled that where an employer has inaccurate records, the Secretary of the Department of Labor carries her burden under the FLSA if she proves that: (1) employees have "in fact performed work for which [they were] improperly compensated;" and (2) if she "produces *sufficient evidence* to show the amount and extent of that work *as a matter of just and reasonable inference*."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) (emphasis added); *Reich v. Southern Maryland Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995).  At trial and in their post-trial submissions, Defendants argued that Plaintiff failed to carry her burden to demonstrate damages, in part, because she did not provide appropriate representational testimony from Self Pride employees during trial.  Although numerous employee timesheets and pay stubs were entered into evidence at trial, Plaintiff did not provide live testimony from Self Pride employees.  However, in support of Plaintiff's Motion for Partial Summary Judgment, she provided declarations from 34 Self Pride employees as evidence of Defendants' liability. Defendants did not include any affidavits from CLAs in support of its Response in Opposition to Plaintiff's Motion for Partial Summary Judgment, nor did Defendants present specific evidence to challenge the statements contained in the affidavits.  As stated above, this Court determined

that Defendants were liable for violations of the FLSA on summary judgment, in part, because employees performed work for which they were improperly compensated.  Therefore, the Secretary satisfied the first part of her burden, as described in *Mt. Clemens Pottery Co.*, at the summary judgment stage.

Defendants assert that "[t]o be properly tried on a representative basis, the Secretary must first demonstrate that the evidence being presented through a subgroup of employers [sic] will be the foundation of a liability finding as to all other employees."  (Defs.' Proposed Findings at 6.) Defendants opine that "[p]ermitting the Secretary to rely on the declarations of thirty four (34) employees and then simply label them 'representative' finds no support in the case law."  (*Id.*) This Court, in its summary judgment memorandum opinion and order, at pre-trial conferences, and throughout trial, has sought to make it abundantly clear that Defendants' *liability* for violations of the FLSA was determined at summary judgment.  This Court will once again state that the Defendants' liability was *not* an issue at trial and this Court declines Defendants' invitation to revisit its liability determination.[7]

Furthermore, Defendants are simply mistaken to the extent that they are suggesting that the Secretary extrapolated all of her *damages calculations* based on 34 employees.  The Secretary went through, in immense detail, the basis of her damages calculations.  As will be discussed in more detail below, the Secretary analyzed reams of paper to determine each particular employee's back wages figure based on that employee's records, to the extent the

---

[7]  Although Plaintiff did not move for summary judgment on the issue of damages, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."  *See* 10B Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 2736 (3d ed. 1998) (discussing summary judgment on the issue of liability).

records were available.  For missing records either an individual average or a universal average was applied depending on what percentage of timesheets were missing for that particular employee.

Defendants contend that the Court "may not properly assume that simply because proof was offered that a few employees worked overtime, that all employees worked the same overtime."  (Defs.' Proposed Findings at 5.)  Setting aside any inaccuracy in Defendants' characterization of Plaintiff's damage calculation process, one point that was overwhelmingly clear at trial was Defendants' utter lack of thorough and accurate employee time records.[8]  In such instances, where records are missing or inaccurate, the Secretary must "show the amount and extent of that work *as a matter of just and reasonable inference*."  *Mt. Clemens Pottery Co.*, 328 U.S. at 688 (emphasis added).  The Secretary went through painstaking efforts to meet this just and reasonable inference standard.  While Defendants have made suggestions by way of legal argument that the Secretary's damages figures are unjust and unreasonable, they have simply failed "to come forward with *evidence* of the precise amount of work performed or with *evidence* to negative the reasonableness of the inference to be drawn from [the Secretary's] evidence."  *Mt. Clemens Pottery Co.*, 328 U.S. at 688 (emphasis added) (noting that after the plaintiff meets its burden, the burden shifts to the employer to produce evidence).  Defendants have presented no such *evidence*.  "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."  *Id.*

Defendants next argue that the Fourth Circuit's opinion in *Reich v. Southern Maryland Hospital, Inc.*, 43 F.3d 949 (4th Cir. 1995) supports the contention that representational

---

[8]  This observation is consistent with the Court's ruling on summary judgment.

testimony must be offered by the Secretary to meet its burden to establish damages.  In *Southern Maryland Hospital*, the Fourth Circuit "agree[d] with defendants that the evidence [did] not support the district court's award of liquidated damages and back pay of $4.2 million based on the testimony from only 54 of 3368 employees, representing 1.6% of the total employee population."  *Reich v. Southern Maryland Hospital, Inc.*, 43 F.3d 949, 951 (4th Cir. 1995).  More specifically, the Fourth Circuit held that the "district court abused its discretion in limiting the number of witnesses and finding *liability* based on 1.6% of the employee population."  *Id.* at 952 (emphasis added).  In this case, however, liability was determined at the summary judgment stage of the proceedings and was not an issue at trial.

In support of its summary judgment motion, Plaintiff submitted the declarations of 34 CLAs to establish a pattern and practice of FLSA violations concerning Self Pride CLAs.  Plaintiff specifically addressed the representational testimony issue on summary judgment, noting that as of February 15, 2005 Plaintiff had calculated 497 past and present employees of Self Pride due back wages.  Plaintiff noted that the declarations are from 6.8% of the 497 employees.  Defendants, however, did not discuss representational testimony, or present any evidence illustrating any genuine issue of material fact concerning this issue, at the summary judgment stage when liability was being addressed, but instead waited until during the trial on damages.  As previously indicated, the Court is awarding back wages for 392 CLAs for the period covering September 4, 2000 through October 16, 2005, a shorter period than the one sought by the Plaintiff.  The 34 declarations amount to approximately 8.5% of the 392

employees for whom the Court is awarding back wages.[9]

Furthermore, the Fourth Circuit in *Southern Maryland Hospital*, noted that the representational employees were from different departments and performed different job functions. *See id.* at 952. This case is clearly distinguishable because the declarations are all from Self Pride CLAs, who perform or performed the same job function. In fact, based on Defendants' representation at trial that one person for whom back wages were calculated, Celeste Hand, was an administrative employee and not a CLA, Plaintiff agreed not to include her among the group of employees for whom Plaintiff seeks back wages.

Based on the procedural posture of this case, Plaintiff was not required to present live testimony at trail to prove the amount of back wages due. *See e.g.*, *Reich v. Gateway Press*, 13 F.3d 685, 688 (3d Cir. 1999) ("We disagree with the district court's conclusion that the failure to testify at trial is necessarily fatal to an employee's claim for back wages, for there are other modes of proof."); *Marshall v. Mammas Fried Chicken, Inc.*, 590 F.2d 598 (5th Cir. 1979) (stating that the Secretary had provided a sufficient basis to calculate the number of hours worked by each employee through the testimony of a government compliance officer who had

---

[9] Of the 34 CLAs who submitted declarations at summary judgment, the employment periods indicated in their declarations do not all fall entirely within the period covering September 4, 2000 through October 16, 2005. Defendants argue in their post-trial submission that at least five of the 34 employees who submitted declarations were later found to be exempt and not entitled to overtime. While this statement is not supported by any of the evidence presented at trial, the Court does note that it appears that at least six of the employees whose declarations were provided at the liability phase indicated on their declarations that they were employed with Self Pride some time *prior* to September 4, 2000. If the Court found that the Defendants acted willfully, as the Secretary asserted, then the time period for back wages would have commenced on November 30, 1999. As the Secretary noted in her letter dated November 22, 2005 to the Court, all 34 of the employees who submitted declarations would have been owed back wages if the back wage calculation reached back to November 30, 1999. Even assuming *arguendo* that the Court should look to only 28 of the declarations, this portion is over 7% of the 392 employees who will be awarded back wages. Obviously, this is a substantially larger percentage than the 1.6% discussed in *Southern Maryland Hospital.* Furthermore, the damage award in this case is substantially smaller than the $4.2 million in *Southern Maryland Hospital.*

reviewed payroll records and submitted computations of unpaid wages for each employee).   On

summary judgment, Plaintiff presented the requisite representational testimony from CLAs to

establish a pattern and practice of FLSA violations committed by Defendants.  It was in no way

necessary to duplicate this process at the trial on *damages* by requiring Plaintiff to call these

witnesses live.


      C.        Damages

      Pursuant to 29 U.S.C. § 216(c) and 29 U.S.C. § 217 Plaintiff can obtain damages for

violations of the FLSA in the form of back wages.  As previously noted, Billie Preston, Assistant

District Director of the Baltimore Regional Office of the Wage-Hour Division, U.S. Department

of Labor, provided extensive testimony concerning the amount of back wages due Self Pride

CLAs and how these back wages were calculated.  Updated numbers were also provided in

Plaintiff's post-trial submissions.  In particular, the Court requested figures covering the period

from September 4, 2000 through October 16, 2005.[10]  For this period, 392 Self Pride CLAs were

owed back wages.  As determined by this Court on summary judgment, Plaintiff is entitled to

collect liquidated damages for the 120 employees listed in Plaintiff's First Amended

Complaint.[11]  Of the 120 employees listed, Preston determined that 96 were due back wages for

---

[10]  See *supra* n. 5.

[11]  Plaintiff's Complaint requested, in part, judgment pursuant to Section 16(c) of the FLSA for "certain present and former employees of Defendants listed on the attached Schedule A . . . ."  (Compl. VIII); *See* 29 U.S.C. § 216(c).  Schedule A, attached to Plaintiff's Complaint, contains 120 names of present and former employees of Self Pride.  This Court denied Plaintiff's request to Amend its Complaint to add some 300 names to this list.  As the Court has previously noted in these proceedings, in seeking Section 16(c) relief for liquidated damages, Plaintiff is limited to the 120 names listed in Schedule A attached to its Complaint.  "Section 16(c) authorizes the Secretary to recover back wages as well as liquidated damages *on behalf of those employees specifically named in a complaint*." *Donovan v. University of Texas at El Paso*, 643 F.2d 1201, 1204 (5th Cir. 1981) (emphasis added).

the period covering September 4, 2000 through October 16, 2005.  Based on Preston's post trial

calculations, Defendants owe $372,663.91 in back wages to 392 current and former employees.

These back wages cover the time period from September 4, 2000 through October 16, 2005.

Based on this same time period, 96 employees are owed liquidated damages in the amount of

$155,239.72.  The total damage award for the period from September 4, 2000 through October

16, 2005 is $527,903.63.

 To determine these amounts, Preston and his staff, under his supervision, reviewed all the

time and pay records produced by Defendants.  Preston also reviewed other miscellaneous

documents produced by Defendants in instances where the time and pay record for certain

employees were missing or to assist, in some instances, in determining an employee's periods of

employment.  The data from this information was inputted into Microsoft Excel spreadsheets

programmed to perform certain calculations (e.g., adding, subtracting, multiplying).

 All of Preston's calculations were based on the determinations made in this Court's

summary judgment ruling.  Preston's calculations can be largely placed in one of two categories.

Calculations for employees using available "hard data", which includes timesheets and payroll

documents.  For employees who did not have "hard data" available because of missing records, a

reconstruction approach was used.

 This reconstruction approach is described in detail in this Court's Findings of Fact.  In

sum, an individual average was used for employees with timesheets available for 30% or more of

their pay periods.  This average was then multiplied by the number of pay periods for which

there were no corresponding timesheets to derive the reconstructed back wages due.  This

reconstructed amount was then added to the amount of back wages calculated based on "hard

data" for a total back wages due figure for that employee. For employees with timesheets available for less than 30% of their pay periods, Preston developed a universal average. Post-trial, a universal average of $59.23 was calculated for the period September 4, 2000 through October 16, 2005.

In all respects, the Court finds Preston's calculations to be reasonable and sufficient to show the amount and extent of the work performed by Self Pride's current and former CLAs "*as a matter of just and reasonable inference*." *Mt. Clemens Pottery Co.*, 328 U.S. at 688 (emphasis added). As already noted, Defendants have simply failed "to come forward with *evidence* of the precise amount of work performed or with *evidence* to negative the reasonableness of the inference to be drawn from [the Secretary's] evidence." *Mt. Clemens Pottery Co.*, 328 U.S. at 688 (emphasis added) (noting that after the plaintiff meets its burden, the burden shifts to the employer to produce evidence). Defendants called only two witnesses at trial concerning the damages issue: Jerome Robinson and Barbara Robinson. Neither testified that any of the employees at issue did not actually work the time recorded on their timesheets. Although Adolphus Carr was identified as the Self Pride employee responsible for reviewing and modifying timesheets, he was not called as a witness. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.*

Therefore, Defendants owe $372,663.91 in back wages to 392 current and former employees. In addition, Defendants owe 96 employees liquidated damages in the amount of $155,239.72. The total damage award owed by Defendants is $527,903.63.

D.    Injunctive Relief

Section 17 of the FLSA permits a court to enjoin violations of the FLSA.  29 U.S.C. §

217.  Whether to issue injunctive relief is a decision within the sound discretion of the court.  *See*

*Martin v. Funtime*, 963 F.2d 110, 113 (6th Cir. 1992) (discussing FLSA).  In determining

whether to issue a prospective injunction under the FLSA, courts consider (1) the employer's

previous conduct, (2) its current compliance (or noncompliance), and (3) the dependability of

any assurances that it will comply with the FLSA in the future.  *See e.g., Reich v. Petroleum*

*Sales*, 30 F.3d 654, 657 (6th Cir. 1994) (noting the imposition of an injunction is not punitive

and does not impose a hardship on the employer because it requires the employer to comply with

the FLSA, which is already required); *Funtime*, 963 F.2d at 114.

As previously mentioned, it became very evident at trial that Defendants' record-keeping

violations were egregious, as a large number of employee timesheets were missing.  Defendants

have failed to establish that they are in compliance with the overtime and record-keeping

provisions of the FLSA.  Furthermore, Defendants have not provided meaningful assurances that

they will comply with the FLSA in the future.  These factors warrant a permanent injunction

against Defendants enjoining them to comply with the FLSA in the future.


III.    <u>Conclusion</u>

For the reasons stated above, the Court finds that Defendants' violations of the FLSA

were not willful.  Judgment shall be entered in favor of the Plaintiff and against the Defendants

in the amount of $527,903.63.  In addition, Defendants are enjoined from violating the FLSA in

the future.  A separate Order and Judgment will follow.

Dated: January 13, 2006                                    /s/
                                                    Richard D. Bennett
                                                    United States District Judge